UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

APPEAL NO. 14-10082-FF

YOLANDA GEVARZES,

      Appellant,          Lower Court No.: 6:12-cv-1126-ORL-18-DAB

vs.

CITY OF PORT ORANGE,

      Appellee.

---

## **APPELLEE CITY OF PORT ORANGE'S INITIAL BRIEF**

---

APPEAL FROM U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

JOSHUA B. WALKER, ESQ.
Florida Bar No. 0047614
JWalker@drml-law.com
F. SCOTT PENDLEY, ESQ.
Florida Bar No. 0341347
FPendley@drml-law.com
Dean, Ringers, Morgan & Lawton, P.A.
Post Office Box 2928
Orlando, Florida 32802-2928
Tel: 407-422-4310; Fax: 407-648-0233
Attorneys for Appellee City of Melbourne

APPEAL CASE NO.: 14-10082-FF
*Gevarzes v. City of Port Orange*
Page 1

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to 11th Cir. R. 26.1-1, the City of Port Orange, Florida, and undersigned counsel certify that Appellant's Certificate of Interested Persons and Corporate Disclosure Statement is complete.

C-1 of 1

i

## STATEMENT REGARDING ORAL ARGUMENT

The City of Port Orange does not believe the disposition of this appeal would be significantly aided by oral argument, as the issues presented herein have been previously decided by clear and controlling law. Nonetheless, the City would be pleased to present oral argument if the Court believes such presentation would aid in the determination of this appeal.

# TABLE OF CONTENTS

Certificate of Interested Persons and Corporate
 Disclosure Statement.................................................................................i

Statement Regarding Oral Argument..................................................... ii

Table of Contents .............................................................................iii-iv

Table of Citations ............................................................................. v-vii

Preliminary Statement............................................................................1

Statement of Jurisdiction.......................................................................2

Statement of the Issues..........................................................................3

Statement of the Case............................................................................3

    I.      Nature of the Case .............................................................3

    II.    Course of Proceedings and Disposition in the Court Below.................4

Statement of Facts.................................................................................5

    I.      Yolanda Gevarzes is a deaf person who communicates
          with American Sign Language, lip reading, and written English .........5

    II.    Gevarzes committed the crime of domestic battery when she
          bit Lonnie Behrens in the parking lot of Chili's Bar and Grill .............8

    III.   Gevarzes communicated in writing with the City's police
          officers prior to her arrest...................................................10

    IV.   It is the City's policy to ensure effective communication
          between police officers and the hearing impaired whenever
          reasonably possible............................................................17

    V.    Standard of Review ...........................................................19

Summary of the Argument.......................................................................20

Argument and Citations of Authority ....................................................20

    I.    Gevarzes cannot claim discrimination under the RA or ADA
           when she was not arrested *because of* her disability, but
           rather was properly arrested for domestic battery.............................22

    II.    The police officers accommodated Gevarzes' hearing disability
           by providing her with a pen and paper to ensure effective
           communication ...................................................................................25

          A.    The ADA and the Rehabilitation Act do not require
                 police officers to furnish a deaf suspect with a sign
                 language interpreter.................................................................26

          B.    Gevarzes communicated effectively with the police
                 officers at the time of her arrest................................................29

    III.    Bringing an interpreter to the Chili's parking lot was not
           reasonable under the circumstances ....................................................32

    IV.    Even if the police officers discriminated against Gevarzes, such
           discrimination was not intentional, as the officers reasonably
           believed they were effectively communicating with her ....................36

    V.    Even if an individual officer did knowingly violate Gevarzes'
           rights, that conduct is not attributable to the City where the
           City's policies specifically prohibit the type of discrimination
           alleged by Gevarzes...........................................................................40

Conclusion.................................................................................................42

Certificate of Compliance with Rule 32(a)............................................44

Certificate of Service ...............................................................................45

# TABLE OF CITATIONS

CASES                                                                                PAGES

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242; 106 S. Ct. 2505;
   91 L. Ed. 2d 202 (1986) ..................................................................................21, 28

*Armstrong v. Wilson*, 124 F.3d 1019 (9th Cir.1997) ..............................................23

*Badillo v. Thorpe*, 158 Fed. Appx. 208 (11th Cir. 2005) .......................................37

*Bahl v. City of Ramsey*, 695 F.3d 778 (8th Cir. 2012)................................32, 34, 35

*Bircoll v. Miami-Dade Cnty*,
   480 F.3d 1072 (11th Cir. 2007) ...................... 23, 25, 26, 27, 28, 29, 31, 32, 33, 34

*Buckley v. Haddock*, 292 Fed. Appx. 791 (11th Cir. 2008)....................................33

*Cash v. Smith*, 231 F.3d 1301 (11th Cir. 2000) ......................................................22

*Celotex Corp. v. Catrett*, 477 U.S. 317; 106 S. Ct. 2548;
   91 L. Ed. 2d 265 (1986) ......................................................................................21

*City of Los Angeles v. Lyons*, 103 S. Ct. 1660 (1983) ...........................................37

*Crawford v. Indiana Dept. of Corrections*, 115 F.3d 481(7th Cir.1997),
   cert. denied; 524 U.S. 937; 118 S. Ct. 2340; 141 L. Ed. 2d 711 (1998)................23

*Duffy v. Riveland*, 98 F.3d 447 (9th Cir.1996) ..................................................22, 25

*Gorrell v. Delaware State Police*, Civ. A. 98-649-SLR,
   1999 WL 1893142 (D. Del. Oct. 20, 1999) ............................................................23

*Hainze v. Richards*, 207 F.3d 795 (5th Cir. 2000)..................................................33

*Holbrook v. City of Alpharetta, Ga.*, 112 F.3d 1522 (11th Cir. 1997) ...................27

*Lee v. Ferraro*, 284 F.3d 1188 (11th Cir. 2002).....................................................19

*Liese v. Indian River County Hospital District*,
  701 F.3d 334 (11th Cir. 2012) ............................................................37, 40, 41, 42

*Martin, et. al., v. Halifax Healthcare Systems, Inc., et al.*,
  Case No: 6:12-cv-1268-Orl-31DAB (M.D. Fla. 2014) ............................................8

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574;
  106 S. Ct. 1348; 89 L. Ed. 2d 538 (1986).................................................................21

*Patrice v. Murphy*, 43 F. Supp. 2d 1156
  (W.D. Wash. 1999) ........................................... 22, 23, 24, 25, 34, 38, 39

*Rosen v. Montgomery County Maryland*, 121 F.3d 154 (4th Cir. 1997)...........23, 24

*Sada v. City of Altamonte Springs*, 434 F. Appx. 845, 850 (11th Cir. 2011)......5, 25

*Scott v. Harris,* 550 U.S. 372, 380 (2007) .........................................................22, 31

*Shotz v. Cates,* 256 F.3d 1077 (11th Cir. 2001).........................................................37

*Shurick v. Boeing Co.*, 623 F.3d 1114 (11th Cir. 2010) ....................................19, 21

*Tennessee v. Lane*, 541 U.S. 509 (2004) ................................................................27

*Tucker v. Tennessee*, 539 F.3d 523 (6th Cir. 2008)....................................27, 32, 34

*T.W. ex rel. Wilson v. Sch. Bd. Of Seminole Cnty., Fla.*,
  610 F.3d 334 (11th Cir 2010) ................................................................................37

*Waller ex rel. Estate of Hunt v. Danville, Va.*,
  556 F.3d 171 (4th Cir. 2009) ..........................................................................32, 35

*Wood v. President & Trs. of Spring Hill Coll. In City of Mobile*,
  978 F.2d 1214 (11th Cir. 1992) ..............................................................................37

## RULES AND STATUTES

28 C.F.R. § 35.160(b)(1) ............................................................................ 26

28 C.F.R. § 35.160(b)(2) ........................................................................ 26, 27

28 C.F.R. § 35.164 ................................................................................... 27

42 U.S.C. § 1983 ....................................................................................... 4

Fed. R. Civ. Proc. 56(c) ........................................................................ 20, 21

## OTHER

§ 504 of the Rehabilitation Act ............................................................... 3, 4

Title II of the Americans with Disabilities Act .............................................. 3, 4, 26

## PRELIMINARY STATEMENT

References to the Record on Appeal will contain an abbreviation of the document referenced, followed by the docket number where that document exists in the Record. For example: (Second Am. Cmpl. [Doc. 48]); (Gevarzes Dep. 85:14-18 [Doc. 60-2]); (P.P. ____ [Doc. 60-15]).

## STATEMENT OF JURISDICTION

Pursuant to 11th Cir. R. 28-2, the City of Port Orange certifies that the Statement of Jurisdiction contained in Appellant's Initial Brief is accurate.

## STATEMENT OF THE ISSUES

Whether the district court properly determined that Gevarzes failed to demonstrate a genuine dispute as to any material fact and that the City of Port Orange is entitled to judgment as a matter of law.

## STATEMENT OF THE CASE

### I.    Nature of the Case.

Appellant Gevarzes was the Plaintiff in the court below. She brought this action against the City following her domestic battery arrest on July 23, 2011. Gevarzes was arrested outside of a Chili's Bar and Grill after getting into a fight with her boyfriend and another friend. When her boyfriend, Lawrence "Lonnie" Behrens, attempted to intervene in the altercation, Gevarzes bit him. At that point, employees of the Chili's restaurant called the Port Orange Police Department for assistance. Port Orange police officers arrived on the scene and arrested Gevarzes for domestic battery.

Gevarzes is deaf and communicates using American Sign Language ("ASL") along with other means of communication. The crux of this lawsuit was the claim that the police officers should have provided Gevarzes with a sign language interpreter prior to arresting her for domestic battery. From that theory, Gevarzes pursued claims against the City under § 504 of the Rehabilitation Act ("RA") and Title II of the Americans with Disabilities Act ("ADA").

3

The only issue presented by this appeal is whether the City of Port Orange violated the RA and ADA by intentionally discriminating against Gevarzes on the basis of her hearing disability. As discussed herein, there are five distinct grounds upon which the summary judgment order in favor of the City should be affirmed. Each of those grounds is independently dispositive of Gevarzes' claims.

## II.    Course of Proceedings and Disposition in the Court Below.

The Second Amended Complaint brought claims against the City pursuant to § 504 of the Rehabilitation Act ("RA") (Count I) and Title II of the ADA claim (Count II). (Second Am. Cmpl. [Doc. 48].) Gevarzes also attempted to state a claim for a constitutional violation pursuant to 42 U.S.C. § 1983 (Count III), but she later dismissed that claim with prejudice. (Notice of Dismissal [Doc. 53].)

The City moved for summary judgment on the remaining claims. [Doc. 61.] Gevarzes opposed the motion [Doc. 68], and the City replied. [Doc. 69.] On December 2, 2013, the district court entered its order granting final summary judgment to the City. [Doc. 74.] It is from that order that Gevarzes appeals.

Gevarzes argues at length in her Initial Brief that a sign language interpreter would have allowed her to better present her self-defense theory to the police officers on the scene of her arrest. These arguments are a red herring, as there are no claims presented by this appeal challenging the validity of Gevarzes' arrest. Although she initially brought false arrest claims against the City (arguing that the

4

officers should have analyzed her self-defense claim at the scene of the arrest), those claims were dismissed with prejudice by the district court. (Order on Dismissal [Doc. 39].) The district court found that probable cause existed for Gevarzes' arrest and that the officers were not required to analyze her self-defense claims. (*Id* at pp. 9-12 (citing *Sada v. City of Altamonte Springs*, 434 F. Appx. 845, 850 (11th Cir. 2011)). Gevarzes has not challenged the order dismissing her false arrest claims. Thus, the appropriateness of her arrest is not in dispute.

## STATEMENT OF FACTS

### I.    Yolanda Gevarzes is a deaf person who communicates with American Sign Language, lip reading, and written English.

Appellant Yolanda Gevarzes states she is naturally a 100 percent deaf individual. (Gevarzes Dep. 36:3-16 [Doc. 60-2].) Gevarzes grew up in New York and associates with being an "English person," capable of writing and comprehending English. (Gevarzes2 Dep. 42:13-23 [Doc. 60-3].) She has hearing aids which allow her to hear loud sounds and vibrations, but she doesn't wear them because they give her a headache. *Id.* Despite this disability, Gevarzes graduated from a mainstream American high school, during which she was taught to read and was required to take and pass the standard English courses. (Gevarzes Dep. 26:4-29:14 [Doc. 60-2].) She admits she can read and write in English so long as the communication is limited to short and simple sentences. (Gevarzes Dep. 83:6-13 [Doc. 60-3].)

Gevarzes frequently interacts with the hearing world without the assistance of sign language interpreters. She has worked as an exotic dancer in a gentleman's club (Gevarzes Dep. 37:9-40:4 [Doc. 60-2]); served alcohol from a beer cart (Gevarzes Dep. 86:23-87:14 [Doc. 60-2]); and held a clerical job requiring her to alphabetize and file medical documents. (Gevarzes Dep. 50:4-52:9 [Doc. 60-2].) She has an e-mail account, which she lists as a contact method on her medical records. (Gevarzes Dep. 16:16-17:16 [Doc. 60-2]; Handwritten medical records [Doc. 60-10].) Gevarzes has also been in several relationships with hearing men who do not know ASL, including a seven-year relationship with Lonnie Behrens. (Gevarzes Dep. 13:24-14:2 [Doc. 60-2]; Gevarzes2 Dep. 11:24-12:24 [Doc. 60-3].)

As a child, Gevarzes initially attended a school for the deaf, where she learned to read lips. (Gevarzes Dep. 54:2-9 [Doc. 60-2].) Gevarzes is still able to read lips, although she cannot do so with 100 percent accuracy. (Gevarzes2 Dep. 19:18-20:4 [Doc. 60-3].) Gevarzes has used lip-reading to effectively communicate with customers when she worked as a dancer at a gentlemen's club, asking them to buy her food and drinks using mostly lip reading and natural gestures. (Gevarzes Dep. 40:8-41:6 [Doc. 60-2].) Gevarzes was also able to teach one of her past boyfriends how to understand her voice, stating they were able to communicate through vocalizations, body language, and basic finger-spelling. (Gevarzes Dep. 90:10-21 [Doc. 60-2].)

Gevarzes admits that she can read and write English, claiming she is most competent with "short and simple" sentences. (Gevarzes Dep. 83:6-13 [Doc. 60-2]; Gevarzes2 Dep. 42:13-23 [Doc. 60-3].) On numerous medical forms, Gevarzes has stated that she understands both ASL and English. (Handwritten medical records [Doc. 60-10].) She is capable of accurately answering true/false medical questionnaires and providing detailed medical history information. Some examples of Gevarzes' handwriting to doctors include:

> I just born a baby on 6/8/2006 after cause me bad headache for 3 1/2 week. (Handwritten medical records 06/29/06 [Doc. 60-2, Exh. A]).

> I'm worried, my ass still bleed lot; stright 3 days and today. Seem bad pain inside ass like, hard explian to you, plus really bad mirgane balance. Feel high fever – HOT and cold up to down. (Handwritten medical records 05/22/10 [Doc. 60-10]).

> I'm worry about my breast (both) real bad. I need Dr check on my breast I don't know if I have cancer or lump. Please find out my breast. (Handwritten medical records 06/28/10 [Doc. 60-10]).

> last Sat I'm sick worse weak no eat for 5 days and High Fever sore throat earache and both ear + my stomach – sharp – hurt – try vomit but not yet... (Handwritten medical records 10/21/10 [Doc. 60-10]).

> I have bad mirgaine and heavy bleed (endomitriosis) & Front + Back Ass – my mom's history (hestrected) for 3 weeks. I'm weak, hard breath. Sharpe. (Handwritten medical records 11/05/10 [Doc. 60-10]).

Yes, I'm bleeding. I don't know what happen. I was surgery last Dec 7, 2010 (undecipherable). (Handwritten medical records 06/01/11 [Doc. 60-10]).

Yes, I'm sick, Dizzy & my stomach and I has stant in my neck. My eyes like Blurrse. (Handwritten medical records 08/29/12 [Doc. 60-10]).

At the same time Gevarzes was pursuing the instant action in the case below, she was also pursuing a separate claim against Halifax Hospital for allegedly failing to provide her a sign language interpreter while she was visiting her daughter in the hospital. *Martin, et al. v. Halifax Healthcare Systems, Inc., et al.*, Case No: 6:12-cv-1268-Orl-31DAB (M.D. Fla. 2012). By order dated April 11, 2014, the United States District Court for the Middle District of Florida granted summary judgment to the defendants on all claims. *Martin, et al. v. Halifax Healthcare Systems, Inc., et al.*, Case No: 6:12-cv-1268-Orl-31DAB (M.D. Fla. 2014) [Supp. Appx. at Order.] The hospital argued they were able to effectively communicate with Gevarzes through alternative means, including written notes, gestures, and in some instances a video relay service. *Id.* The district court found that Gevarzes failed to present any evidence that these alternative methods of communication were ineffective. *Id.*

## II.    Gevarzes committed the crime of domestic battery when she bit Lonnie Behrens in the parking lot of Chili's Bar and Grill.

On July 23, 2011, at approximately 11:00 p.m., Gevarzes, her boyfriend Lonnie Behrens, and their mutual acquaintance Jason McConnell engaged in a

violent and alcohol-fueled argument at a Chili's Bar and Grill. (Gevarzes Dep. 132:2-133:24 [Doc. 60-2].) Gevarzes, Behrens, and McConnell had all been drinking at the bar for some time. (Gevarzes Dep. 137:20-138:23 [Doc. 60-2].) Gevarzes, who was only 106 pounds at the time of her arrest, had consumed two glasses of wine and at least half of a Long Island Iced Tea. (Gevarzes Dep. 134:8-20; 135:4-16 [Doc. 60-2]; Behrens Dep. 20:23-21:2 [Doc. 60-1]; PHS Intake Records [Doc. 60-12].) As the evening progressed, the individuals in the group became notably intoxicated. (McConnell Dep. 16:8-19; [Doc. 60-4]; Gevarzes Dep. 137:12-13; 151:18 [Doc. 60-2].)

An argument broke out between Gevarzes and McConnell over the amount of tip McConnell left the bartender. (Gevarzes Dep. 137:20-138:23 [Doc. 60-2].) The argument created a scene in the packed restaurant, and as the group left the bar, Gevarzes' emphatic gestures and escalating volume was enough for a bystander to call the police. (McConnell Dep. 16:1-7; 17:1-6; 19:13-18 [Doc. 60-4]; Gevarzes Dep. 138:23-25 [Doc. 60-2].)

The argument continued by Gevarzes' car which was in a handicapped parking space directly in front of the restaurant door. (McConnell Dep. 18:7-15 [Doc. 60-4]; Behrens Dep. 28:24-29:4 [Doc. 60-1].) By this point, it was nearly 11:00 p.m., and other Chili's patrons were still entering the restaurant. (Slease Dep. 36:23-25 [Doc. 60-7]; Rizzo Dep. 89:11-24 [Doc. 60-5]; Gevarzes Dep. 142:4-6

9

[Doc. 60-2].) The loud verbal exchanges escalated in nature. (McConnell Dep. 18:5-8 [Doc. 60-4].) The altercation became physical when Gevarzes pushed McConnell. (Gevarzes Dep. 139:14-25; 141:6-9 [Doc. 60-2]; McConnell Dep. 18:4-12 [Doc. 60-4].) Gevarzes continued swinging at McConnell and was "raising hell" in the parking lot. (Behrens Dep. 69:2-24 [Doc. 60-1].) Gevarzes attempted to leave, but McConnell stood behind her car and wouldn't let her leave. (Gevarzes Dep. 140:1-10 [Doc. 60-2].) Gevarzes once again went hands-on with McConnell and "physically moved" him out of the way. *Id.*

In an effort to stop the escalating violence, Behrens grabbed Gevarzes from behind and tried to pull her off of McConnell. (Gevarzes Dep. 140:15-141:14 [Doc. 60-2]; Behrens Dep. 69:2-24 [Doc. 60-1].) Gevarzes then bit Mr. Behrens in the chest. *Id.* The police arrived shortly thereafter. *Id.* When the police arrived, the parties were still arguing and yelling at each other. (Kilpatrick Dep. 28:20-25 [Doc. 60-8]); Audio Rec. [Doc. 59].)

### III.   Gevarzes communicated in writing with the City's police officers prior to her arrest.

Sergeant Kimberly Vingara-Kilpatrick was the first to arrive on the scene. (Kilpatrick Dep. 28:8-13 [Doc. 60-8].) As Sergeant Kilpatrick arrived, she immediately noticed Gevarzes, McConnell, and Behrens screaming and gesticulating at each other. (Kilpatrick Dep. 28:20-29:22 [Doc. 60-8]; Gevarzes Dep. 140:1-141:10 [Doc. 60-2].) Gevarzes was attempting to get into her car to

drive home. (Kilpatrick Dep. 28:20-29:22 [Doc. 60-8]; Gevarzes Dep. 140:1-141:10 [Doc 60-2].) Gevarzes appeared to be intoxicated and had the odor of alcohol coming from her body. (Kilpatrick Dep. 54:2-7 [Doc. 60-8].)

Officers Slease and Rizzo then arrived on scene. (Kilpatrick Dep. 29:2-7 [Doc. 60-8]; Gevarzes2 Dep. 17:17-22 [Doc. 60-3].) Gevarzes, McConnell, and Behrens were separated, and an officer spoke with each of them individually. (Kilpatrick Dep. 29:2-7 [Doc. 60-8]; Gevarzes2 Dep. 17:17-22 [Doc. 60-3].)

Sergeant Kilpatrick interviewed Behrens. (Behrens Dep. 70:13-71:15 [Doc. 60-1]; Kilpatrick Dep. 32:1-11 [Doc. 60-8].) Behrens told Sergeant Kilpatrick that Gevarzes pushed and repeatedly swung at McConnell. (Behrens Dep. 79:3-24 [Doc. 60-1]; Kilpatrick Dep. 32:1-11 [Doc. 60-8].) Behrens also told Sergeant Kilpatrick that Gevarzes bit him, and he showed Sergeant Kilpatrick the bite mark. (Behrens Dep. 69:8-17 [Doc. 60-1]; Kilpatrick Dep. 32:1-11 [Doc. 60-8].) The bite left a visible and bloody bruise and a welt on Behrens' chest, and Gevarzes' lipstick was visible on his shirt. (Incident report p. 6 [Doc. 60-11].) While the police were on scene, Behrens continually complained that the bite was painful and "burning." (Behrens Dep. 69:8-17 [Doc. 60-1].) The entire interview with Behrens lasted approximately five minutes. (Audio recording [Doc. 59].)

McConnell recited almost identical facts to Officer Rizzo, including the fact that Gevarzes struck him repeatedly and that she bit Mr. Behrens. (Rizzo Dep.

39:1-5 [Doc. 60-5].) Officer Rizzo also observed the bloody bite mark on Behrens' chest. (Rizzo Dep. 52:22-53:7 [Doc. 60-5].)

Officer Slease interviewed Gevarzes. (Kilpatrick Dep. 29:19-22 [Doc. 60-8].) Officer Slease testified that Gevarzes indicated to him that she was deaf, that she could read lips if he spoke slowly, and that she would nod if she understood what he said and would have him repeat things if she did not. (Slease Dep. 30:4-9 [Doc. 60-7].) Officer Slease also provided Gevarzes with a pen and a pad of paper so she could communicate in writing. (Slease Dep. 31:21-32:3 [Doc. 60-7].)

Officer Slease asked Gevarzes questions, she read his lips, and she responded to his questions in writing. (Handwriting at arrest [Doc. 60-9].) In these writings, Gevarzes introduced herself, explained that she is deaf, stated, "we don't have any problem," explained the cause of the argument, and asked that Officer Slease speak with Behrens. *Id.* Gevarzes also claims that she orally admitted to Officer Slease that she bit Behrens. (Gevarzes Dep. 139-41 [Doc. 60-2].)

Gevarzes' handwritten statement on the night of her arrest was made part of the police report. (Handwriting at arrest [Doc. 60-9].) Gevarzes communicated the following information to the officers on the scene in response to Officer Slease's questions:

> Hi my name is Yolanda. I am Deaf. I try explian to my boyfriend Lonnie -- we don't have any problem w/ my boyfriend about tip $___ I try help explain to Jason. Seen he don't rembmer what I said, Lonnie to interpreter to him. I

explain to him about <u>Tip</u>. He paid <u>$9.00</u> for tip plus $5.00.
Lonnie Interpreter. Lonnie use sign language. Can you talk <u>w/
Lonnie</u>. Jason don't understand what I said. Don't give lonnie
my key my car – <u>No</u>. *Id.*

After completing the interviews, the three officers compared their notes and
determined that Gevarzes was the primary aggressor and that she was responsible
for the bloody and bruised bite mark on Behrens' chest. (Slease Dep. 39:10-13
[Doc. 60-7]; Gevarzes Dep. 150:2-4 [Doc. 60-2].) Gevarzes has since admitted
many times that she actually did bite Behrens. (Gevarzes Dep. 140:15-141:14
[Doc. 60-2].) The officers arrested Gevarzes for domestic battery. *Id.*

The officers handcuffed Gevarzes and placed her in a police cruiser; they
then re-cuffed her hands in front of her body so she could continue to communicate
in writing. (Rizzo Dep. 47:4-15 [Doc. 60-5].) Gevarzes was very mad at this point,
and given her agitated state, Sergeant Kilpatrick found communication via writing
to be more effective. (Gevarzes Dep. 150:14-24 [Doc. 60-2]; Kilpatrick Dep. 36:3-
8 [Doc. 60-8].) The officers moved Gevarzes' handcuffs to the front of her body
allowing her to better communicate. (Rizzo Dep. 47:4-15 [Doc. 60-5].)

Sergeant Kilpatrick wrote "Purse in trunk yes or no," to which Gevarzes
circled "yes." (Handwriting at arrest [Doc. 60-9].) Gevarzes understood Sergeant
Kilpatrick's written communication, and she wanted to lock her purse in the trunk
because she had a "funny feeling." (Gevarzes Dep. 149:1-16 [Doc. 60-2].)
Sergeant Kilpatrick also wrote "Leave car here - car has to be towed - yes or no,"

to which Gevarzes circled "no." (Handwriting at arrest [Doc. 60-9].) Gevarzes understood this written communication as well, and she did not want the car to be towed. (Gevarzes Dep. 151:6-14 [Doc. 60-2].) Gevarzes also wrote on the paper that she did not want the officers to give Behrens her car keys because she felt both Behrens and McConnell were too drunk to drive. (Gevarzes Dep. 151:15-21 [Doc. 60-5]; handwriting at arrest [Doc. 60-9].)

The officers asked Behrens to communicate to Gevarzes that she was being arrested for domestic battery. (Gevarzes Dep. 150:2-13 [Doc. 60-2].) Gevarzes became very upset and thought that Behrens was responsible for her arrest. (Gevarzes Dep. 150:2-13 [Doc. 60-2].) Through gestures, Sergeant Kilpatrick then communicated to Gevarzes that the police, not Behrens, decided to arrest her. (Kilpatrick Dep. at 39-40 [Doc. 60-8].) Throughout these events, the parking lot was very busy, and patrons were continually entering and leaving the restaurant and bar. (Slease Dep. 39:22-25 [Doc. 60-7]; McConnell Dep. 16:8-19, 19:14-21 [Doc. 60-4].)

The officers spent approximately 30 minutes on the scene from the time they were first dispatched - 10:50 p.m. - until the time they left the scene with Gevarzes - 11:22 p.m. (Slease Dep. 36:23-25 [Doc. 60-7].) The officers testified that the conditions of this case would have made waiting for the arrival of a sign language interpreter unfeasible. (Slease Dep. 40:14-23 [Doc. 60-7]); Rizzo Dep. 89:3-23

14

[Doc. 60-5].) Not only was this an emergency, domestic violence situation, but it was a busy time of night, the parties were intoxicated, and they were right in front of Chili's front door. (Rizzo Dep. 89:3-24 [Doc. 60-5]; Slease Dep. 40:14-41:2 [Doc. 60-7]; McConnell 18:9-12 [Doc. 60-5].) The officers are trained that domestic violence situations are "high priority call," because those calls frequently present dangerous situations to the victims, bystanders, and police officers. (Rizzo Dep. 85:13-86:1 [Doc. 60-5].)

The officers then took Gevarzes to the Port Orange holding facility before she was transported to the Volusia County Jail. (Gevarzes Dep. 20:10-18 [Doc.60-2].) Gevarzes spent only the remainder of the night in jail before being released the following day. (Gevarzes2 Dep. 25:12-16 [Doc. 60-3].) Gevarzes claims to suffer from post-traumatic stress disorder (PTSD) as a result of her one night in jail. (Gevarzes2 Dep. 34:17-23 [Doc. 60-3].)[1]

Officer Slease testified that Gevarzes never asked for an alternative form of communication or for a sign language interpreter. (Slease Dep. 44:1-3 [Doc. 60-7].) Sergeant Kilpatrick and Officer Rizzo collaborated this testimony – both of whom testified that Gevarzes never requested an interpreter or an alternate form of

---

[1] Gevarzes has previously been arrested in Arizona for domestic violence. (Gevarzes Dep. 55:5-17 [Doc. 60-2].) The Arizona police also did not provide her with a sign language interpreter, but she claims to have suffered no adverse effects from the experience. (Gevarzes Dep. 57:22-59:6 [Doc. 60-2].)

communication. (Rizzo Dep. 48:4-14, 55:5-14, 91:4-10 [Doc. 60-5]; Kilpatrick Dep. 44:23-45:15 [Doc. 60-8].)

But Gevarzes claims that she asked for a professional interpreter at the scene. (Gevarzes2 Dep. 10:9-22; 15:14-21 [Doc. 60-3].) Specifically, she claims that she wrote this request on a separate piece of paper that was not included with her other handwritten documents in the police report. (Gevarzes2 Dep. 14:11-25 [Doc. 60-3].) In her first deposition, Gevarzes claimed that the City was "obviously . . . just trying to hide it." (Gevarzes Dep. 148:1-24 [Doc. 60-2].) However, when Gevarzes was deposed a second time, she claimed that she kept the piece of paper after her arrest and gave it to her attorney. (Gevarzes2 Dep. 14:24-15:1 [Doc. 60-3].) But Gevarzes' attorney denies having ever received this piece of paper. (Gevarzes2 Dep. 15:22-16:4 [Doc. 60-3].) Neither of the parties ever discovered the alleged missing page that purportedly contained Gevarzes' request for a sign language interpreter. *Id.* Although Gevarzes continues to claim that she requested a professional interpreter, she was never able to produce this writing that she claimed to be in her possession.

## IV.    It is the City's policy to ensure effective communication between police officers and the hearing impaired whenever reasonably possible.

The City of Port Orange Police Department has adopted several policies to ensure effective communication between the police and deaf persons. None of these policies creates a private right of action.

Policy 42.9 creates a uniform procedure for interviewing the hearing impaired. (P.P. 42.9 [Doc. 60-15].) Policy 41.10 addresses issues related to interacting with individuals with physical disabilities. (P.P. 41.10 [Doc. 60-14].) Policy 41.8 outlines the factors to consider in domestic violence investigations (P.P. 41.8 [Doc. 60-13].)

Policy 42.9 requires officers to "furnish appropriate auxiliary aids and services whenever necessary to ensure effective communication with individuals with hearing impairments." (P.P. 42.9.48 [Doc. 60-15].) "Auxiliary aids and services" includes qualified interpreters. (P.P. 42.9.49 [Doc. 60-15].) But it also includes writing materials, note pads, and other effective methods of communication. *Id.* Normally, an officer must give primary consideration to the choice of the individual, unless the officer can show another equally effective means of communication, or that the individual's choice will fundamentally alter procedure, or cause an undue burden. (P.P. 42.9.50-42.9.51 [Doc. 60-15].)

17

The City's Response to Disabilities Policy also has a specific section dealing with speech and hearing disabilities. (P.P. 41-10 [Doc. 60-14].) Port Orange police officers are warned not to confuse the behavior of individuals with hearing and speech disabilities with those of people who intentionally refuse to cooperate or those who abuse illegal substances. *Id.* at p. 5. The City further warns its officers to be aware that an individual's failure to comply with verbal orders does not always constitute defiance, but may be the result of a hearing disability. *Id.*

The Domestic Violence Policy states that communications personnel should ascertain if the victim is hearing impaired and should attempt to make the appropriate resources available to the officers on the scene. (P.P. 41.8.6-41.8.7 [Doc. 60-13].) The policy further directs that if communication with any party is impaired by special needs such as hearing impairment, the officer, when possible, will request that appropriate resources be made available. (P.P. 41.8.27 [Doc. 60-13].) In the instant case, the police dispatcher spoke with a Chili's employee and not a member of Gevarzes' group. (McConnell Dep. 16:1-7; 17:1-6; 19:13-18 [Doc. 60-4]; Gevarzes Dep. 138:23-25 [Doc. 60-2].) Thus, the communications officer had no opportunity to analyze Gevarzes' communication requirements.

The Domestic Violence Policy also requires police officers to inform arrestees of their charges and to explain that the state, not the victim, is responsible for the prosecution. (P.P. 41.8.66 [Doc. 60-13].) Here, the officers communicated

18

to Gevarzes that she was being arrested for domestic battery and that the officers, not Behrens, made this decision. (Kilpatrick Dep. 39-40 [Doc. 60-8].)

Every officer involved in Gevarzes' arrest had been provided these policies during their field training and were familiar with the policy requirements at the time of Gevarzes' arrest. (Kilpatrick Dep. 51:5-53:8 [Doc. 60-8]; Rizzo Dep. 76:9-81:8, 83:10-84:13 [Doc. 60-5]; Slease Dep. 58:12-59:14, 61:8-62:11 [Doc. 60-7].) The officers knew they were required to provide a sign language interpreter if necessary to ensure effective communication. (Kilpatrick Dep. 53:9-21 [Doc. 60-8]; Rizzo Dep. 81:13-82:21, 82:22-83:9, 84:14-85:8, 86:2-9, 90:21-25 [Doc. 60-5]; Slease Dep. 62:6-16, 63:5-16 [Doc. 60-7].) Each officer testified unequivocally that they did not have discretion to ignore the policy requirements. *Id.* All of the officers believed their communication with Gevarzes was effective. *Id.*

## V.    Standard of Review.

This Court conducts a *de novo* review of a district court's order granting summary judgment. *Lee v. Ferraro*, 284 F.3d 1188, 1190 (11th Cir. 2002). Under that standard of review, this Court applies the same legal standards that bound the district court. *Id.* This Court may affirm the district court's judgment on any ground that appears in the record, whether or not that ground was relied upon or even considered by the court below. *Shurick v. Boeing Co.*, 623 F.3d 1114, 1116 n. 2 (11th Cir. 2010) (citation omitted).

## SUMMARY OF THE ARGUMENT

Gevarzes failed to establish any facts necessary to support her claims against the City. Although Gevarzes has tried to create some metaphysical doubt as to the facts of the case, there is no genuine dispute as to any material fact. The district court's summary judgment order may be affirmed upon any of the following five grounds:

(1)    Gevarzes cannot claim discrimination under the RA or ADA when she was not arrested *because of* her disability, but rather was properly arrested for domestic battery;

(2)    The police officers accommodated Gevarzes' hearing disability by providing her with a pen and paper to ensure effective communication;

(3)    The police officers were not required to provide Gevarzes with a sign language interpreter under the exigencies of this arrest;

(4)    Even if the police officers discriminated against Gevarzes, such discrimination was not intentional, as the officers reasonably believed they were effectively communicating with her; and

(5)    The City cannot be held liable for the alleged intentional discrimination of its police officers where the City's policies specifically prohibit the type of discrimination alleged by Gevarzes.

As discussed herein, each of these grounds is independently dispositive of Gevarzes' claims.

## ARGUMENT AND CITATIONS OF AUTHORITY

Federal Rule of Civil Procedure 56(c) provides that summary judgment for the moving party is appropriate when "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "[A]t the summary judgment stage, the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249; 106 S. Ct. 2505; 91 L. Ed. 2d 202 (1986).

While all inferences are drawn in favor of the non-moving party, that party still must present some affirmative evidence supporting its position to defeat an otherwise appropriate motion for summary judgment. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-587; 106 S. Ct. 1348; 89 L. Ed. 2d 538 (1986) (non-movant must "do more than simply show there is some metaphysical doubt as to the material facts") (citations omitted); *Celotex Corp. v. Catrett,* 477 U.S. 317, 324-325; 106 S. Ct. 2548; 91 L. Ed. 2d 265 (1986). Said another way, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252; 106 S. Ct. 2505; 91 L. Ed. 2d 202 (1986).

This Court may affirm the district court's granting of summary judgment on alternative grounds not stated in the summary judgment order. *Shurick,* 623 F.3d at

1116 n. 2. Moreover, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007)

## I.  Gevarzes cannot claim discrimination under the RA or ADA when she was not arrested *because of* her disability, but rather was properly arrested for domestic battery.

Gevarzes cannot claim discrimination under the RA and ADA unless she can show that she was arrested *because of* her disability. That is to say, Gevarzes would have to demonstrate that she was arrested because the police improperly perceived her disability as some indicia of criminal behavior. She is unable to meet that test under the facts of this case, as it is undisputed that Gevarzes was properly arrested for domestic battery.

Gevarzes has correctly pointed out that RA and ADA are governed by the same standard. *See Cash v. Smith*, 231 F.3d 1301, 1305 (11th Cir. 2000); 29 U.S.C. § 794(d). But Gevarzes errs in her description of this standard.

There are, essentially, two separate tests to determine if the ADA or RA has been violated: one where a plaintiff claims that a governmental entity denied him or her access to a service or program, and the other where a governmental entity discriminated against a person because of his or her disability. *Duffy v. Riveland*, 98 F.3d 447, 455 (9th Cir.1996); *Patrice v. Murphy*, 43 F. Supp. 2d 1156, 1160

(W.D. Wash. 1999). Numerous courts have held that an "arrest is not the type of service, program or activity from which a disabled person could be excluded or denied the benefits." *Id.*; *see also Gorrell v. Delaware State Police,* Civ. A. 98-649-SLR, 1999 WL 1893142 (D. Del. Oct. 20, 1999); *Rosen v. Montgomery County Maryland*, 121 F.3d 154 (4th Cir. 1997).

This Court in *Bircoll v. Miami-Dade* declined to weigh in on "whether police conduct during an arrest is a program, service, or activity covered by the ADA." *Bircoll v. Miami-Dade Cnty*, 480 F.3d 1072, 1084 (11th Cir. 2007). Instead, this Court ruled that in the case of an arrest, the proper analysis is whether a public entity subjected an individual to discrimination because of his or her disability. *Id.* at 1084-85. Not whether police denied an arrested individual equal access to some governmental service or program. *Id.*; *see also Armstrong v. Wilson,* 124 F.3d 1019 (9th Cir. 1997) ("[i]ncarceration itself is hardly a 'program' or 'activity' to which a disabled person might wish access") (citing *Crawford v. Indiana Dept. of Corrections*, 115 F.3d 481, 483 (7th Cir. 1997)), cert. denied, 524 U.S. 937, 118 S. Ct. 2340, 141 L. Ed. 2d 711 (1998); *Rosen v. Montgomery County Maryland*, 121 F.3d 154, 157 (4th Cir. 1997) ("calling a[n] . . . arrest a 'program or activity' . . . strikes us as a stretch of the statutory language and of the underlying legislative intent [of the ADA].").

In short, in the context of arrests, the ADA and RA are only violated when a plaintiff is arrested because of his or her disability. *Id.* Said another way, the ADA and RA are only violated when but for a Plaintiff's disability, he or she would not have been arrested. *See id.*

The district court in *Patrice* outlined the policy considerations for this rule:

> There are also numerous policy reasons why the ADA should apply to the context of an arrest only where the arrestee was subjected to discrimination because of his disability (*i.e.,* where plaintiff was arrested because his disability caused behavior that the police mistakenly confused with illegal activity). Where underlying criminal activity has occurred, such as a bank robbery, drunken driving, or domestic violence, and the officers are engaged in an on-the-street response, investigation, and arrest, forestalling all police activity until an interpreter can be located to aid communication with the deaf protagonist would be impractical and could jeopardize the police's ability to act in time to stop a fleeing suspect, physically control the situation, or interview witnesses on the scene. The decisions we ask our officers to make under already stressful, and sometimes dangerous, circumstances should not be subjected to second guessing by comparing their in-the-field actions to the requirements of the ADA. *Patrice v. Murphy,* 43 F. Supp. 2d at 1159-60.

In the instant case, the police did not arrest Gevarzes because she was deaf or because the police misunderstood the situation. They arrested her because she bit her boyfriend in the chest so hard that he had a visible and bloody bruise. (Slease Dep. 39:10-13 [Doc. 60-7]; Gevarzes Dep. 140:15-141:14, 150:2-4 [Doc. 60-2].) The officers were fully aware of what happened, but they still believed that Gevarzes was the primary aggressor. (Slease Dep. 39:10-13 [Doc. 60-7]; Behrens

Dep. 69:8-17 [Doc. 60-1]; Kilpatrick Dep. 32:1-11 [Doc. 60-8]; Rizzo Dep. 39:1-5 [Doc. 60-5].) The police would have arrived at this determination even if Gevarzes had access to an interpreter at the scene. (*See* Rizzo Dep. 57:18-58:10 [Doc. 60-5].)

Importantly, Gevarzes has not challenged the validity of her arrest. The district court dismissed her false arrest claims upon finding that probable cause existed for Gevarzes' arrest, and that the officers were not required to analyze her self-defense claims at the scene of her arrest. [Doc. 39 at pp. 9-12] (citing *Sada v. City of Altamonte Springs*, 434 F. Appx. 845, 850 (11th Cir. 2011)). Gevarzes has not challenged the order dismissing her false arrest claims. Although she has attempted to revive those arguments in her Initial Brief, the validity of her arrest is not at issue in this appeal.

Gevarzes was not arrested because of her disability. She was arrested because the police officers had probable cause to believe that she bit her boyfriend on the chest. Because Gevarzes does not challenge the validity of her arrest, there can be no claim for disability discrimination.

## II. The police officers accommodated Gevarzes' hearing disability by providing her with a pen and paper to ensure effective communication.

Viewing an arrest as a service is improper in the context of the ADA and the RA. *Bircoll,* 480 F.3d at 1084; *Duffy,* 98 F.3d at 455; *Patrice,* 43 F. Supp. 2d at

1160. But even when viewed in this context, the police properly accommodated her hearing disability. Section 12132 of the ADA states:

> [N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity. 42 U.S.C. § 12132 (2014).

The City does not dispute that Gevarzes is a person with a disability or that the City is a public entity. But, assuming for the sake of argument that an arrest is a service, Gevarzes still must prove that she was discriminated against by a public entity and that the discrimination was by reason of her disability. *Bircoll*, 480 F.3d at 1083. She has failed to offer a scintilla of evidence in support of either proposition.

### A. The ADA and the Rehabilitation Act do not require police officers to furnish a deaf suspect with a sign language interpreter.

The ADA's implementing regulations require public entities to provide auxiliary aids when necessary to afford a disabled person with an opportunity to effectively communicate. 28 C.F.R. § 35.160(b)(1); 42 U.S.C. § 12103(1)(A). The type of auxiliary aid required depends on the request of the individual ("the primary consideration"); the method of communication used by the individual; and the nature, length, complexity, and context of the communication. 28 C.F.R. § 35.160(b)(2). A public entity is typically required to consider an individual's

request, "unless it can demonstrate another effective means of communication exists or that use of the means chosen would not be required under § 35.164." *Tucker*, 539 F.3d at 533 (6th Cir. 2008) (citing *Bircoll*, 480 F.3d at 1082; 28 C.F.R. § 35.160(b)(2)).

The ADA "does not require a public entity to employ any and all means to make [interpreters] accessible to persons with disabilities, but only to make 'reasonable modifications' [] that would not fundamentally alter the nature of the service or activity [] or impose an undue burden." *Bircoll*, 480 F.3d at 1082 (citing *Tennessee v. Lane*, 541 U.S. 509, 531-32 (2004)). The proper inquiry is "whether, given criminal activity and safety concerns, any modification of police procedures is reasonable before the police physically arrest a criminal suspect, secure the scene, and ensure that there is no threat to the public or officer's safety." *Id.* at 1085.

Reasonableness "must be decided case-by-case based on numerous factors." *Id.* at 1085-86 (citing *Holbrook v. City of Alpharetta, Ga.*, 112 F.3d 1522, 1527 (11th Cir. 1997)). Relevant factors include: the individual's preference; the ability of the individual to communicate through other means (including writing); exigent circumstances; and the length, complexity, and context of the communication. *Id.* at 1086-87.

27

Determination of reasonable accommodations is proper at the summary judgment stage. *See Bircoll*, 480 F.3d at 1081 (reviewing the reasonable accommodation inquiry at the summary judgment stage). And, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient [to survive summary judgment]; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 252.

In the instant case, Gevarzes has testified that she prefers to communicate with ASL in her daily life. There is no record evidence, however, that Gevarzes requested a sign language interpreter at the scene of her arrest.

The City cites the record and the sworn testimony of three law enforcement officers in support of its claim that Gevarzes did not request an interpreter. (Slease Dep. 44:1-3 [Doc. 60-7]; Rizzo Dep. 48:4-14, 55:5-14, 91:4-10 [Doc. 60-5]; Kilpatrick Dep. 44:23-45:15 [Doc. 60-8].) Gevarzes cites only to a written note, not included in the record, where she allegedly requests an interpreter. (*See* Gevarzes2 Dep. 10:9-22; 14:11-25; 15:14-21 [Doc. 60-3].) This is the same note that Gevarzes initially claimed the police were "obviously . . . trying to hide," but that she later claimed was in her possession all along and had been given to her lawyer (who denies having ever received it). (Gevarzes2 Dep. 15:22-16:4 [Doc.

60-3].) This alleged note was never produced and is not even a "scintilla" of evidence.

Even assuming that the alleged request for an ASL interpreter actually happened, if Gevarzes was able to effectively communicate without a sign language interpreter or if providing an interpreter was not reasonable given the circumstances, then the police did not discriminate against her, and the finding of summary judgment for the City was proper.

### B.    Gevarzes communicated effectively with the police officers at the time of her arrest.

"In many circumstances, oral communication plus gestures and visual aids or note writing will achieve effective communication." *Bircoll*, 480 F.3d at 1088.

Actually writing in English is strong evidence that a person can write in English. Gevarzes responded to officer's questions in written English. (Incident Report [Doc. 60-11].) And the record is replete with numerous medical documents that Gevarzes has been able to complete in written English. (Handwritten medical records [Doc. 60-10].)

Gevarzes attended a school that taught her to read lips, and she admits to using lip-reading as a means of communicating with former customers. She also received a mainstream high school education, and she passed a high school English class. Even if she had help from a sign language interpreter throughout this

experience, the school still exposed her to written and spoken English in an academic context.

Gevarzes marked "English" as a language she understands on her medical records. She worked in a clerical job that required her to alphabetically file documents. Filing may be simple work as Gevarzes argues, but it still requires a passingly competent grasp of the English language.

Even though they were not required to do so, the police officers accommodated Gevarzes' hearing disability by providing her a pen and paper to allow her to communicate with the officers and participate in the investigation. The communication was effective, as Gevarzes still does not claim any fact that wasn't already known to the officers on the scene. The police learned that Behrens grabbed Gevarzes before she bit him. But they also knew that Behrens was attempting to pull Gevarzes off of another man she was hitting. There was no breakdown in communication. The police knew the facts, and they rightfully concluded that Gevarzes committed battery. A governmental entity must provide a deaf person with an effective means of communication, not a perfect method of communication. This could mean a qualified ASL interpreter. But it can also mean a pen and a piece of paper.

The district court rejected Gevarzes' contention that she cannot read and write in English. (Order on Sum. Judgment p. 6 [Doc. 74].) The court was right to

do so, as Gevarzes' loose allegations to the contrary were patently belied by the clear record before the court. *Scott,* 550 U.S. at 380 ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

The district court properly determined that the handwritten notes from the scene of the arrest firmly establish that Gevarzes was able to provide her own account of the evening and that she understood the officers; this was plainly one side of a two-way conversation. (Order on Sum. Judgment p. 6 [Doc. 74].) Indeed, Gevarzes admits that her notes were responsive to the officers' questions. (Gevarzes Dep. 18:12-23 [Doc. 60-3].) Because Gevarzes was clearly able to participate in this straight-forward interview, she cannot now claim that she was intentionally discriminated against on the basis of her disability.

As noted by the district court, Gevarzes' interview on the night of her arrest was very straightforward and did not require any sophisticated communication. (Order on Sum. Judgment p. 7 n. 7 [Doc. 74].) Much like the *Bircoll* case, the communication with Gevarzes "was not so ineffective that an oral interpreter was necessary to guarantee that [Plaintiff] was on equal footing with hearing individuals." 480 F.3d at 1088. Gevarzes was obviously able to understand the

circumstances surrounding her arrest and to effectively communicate with the police officers on the scene.

### III.    Bringing an interpreter to the Chili's parking lot was not reasonable under the circumstances.

Even if the written communication with Gevarzes were somehow ineffective, the police officers were not to provide a sign language interpreter under the exigent circumstances of this arrest. The district court properly determined it would not have been reasonable to expect the police officers to wait around for a sign language interpreter to arrive before arresting Gevarzes. (Order on Sum. Judgment pp. 8-9 [Doc. 74].) This is especially true considering the loud, drunken altercation still underway when the police arrived, and even more so considering the inherently volatile nature of domestic violence situations. *Id.*

This Court in *Bircoll* and a chorus of other circuit courts have held that police officers are not required to stall their criminal investigations to wait for a sign language interpreter to arrive to the scene of a potential arrest, particularly when the officers are faced with tense and uncertain circumstances. *Bircoll,* 480 F.3d 1085; *see also Bahl v. Cnty. of Ramsey,* 695 F.3d 778, 784 (8th Cir. 2012); *Waller ex rel. Estate of Hunt v. Danville, Va.*, 556 F.3d 171, 175 (4th Cir. 2009); *Tucker v. Tennessee*, 539 F.3d 526, 536 (6th Cir. 2008).

"The government has an interest in arrests being completed efficiently and without waste of limited resources; police time and energy that may be needed

elsewhere at any moment." *Buckley v. Haddock*, 292 Fed. Appx. 791, 794 (11th Cir. 2008). "To require the officers to factor in whether their actions are going to comply with the ADA, in the presence of exigent circumstances and prior to securing the safety of themselves, other officers, and any nearby civilians, would pose an unnecessary risk to innocents. *Hainze v. Richards*, 207 F.3d 795, 801 (5th Cir. 2000). In short, "[w]hile the purpose of the ADA is to prevent the discrimination of disabled individuals, we do not think Congress intended that the fulfillment of that objective be attained at the expense of the safety of the general public." *Id.*

This Court in *Bircoll* determined that the "reasonable modification" inquiry should be viewed through the lens of "[t]he exigent circumstances presented by criminal activity and the already onerous tasks of police on the scene." *Bircoll*, 480 F.3d at 1085. "In other words, the question is whether, given criminal activity and safety concerns, any modification of police procedures is reasonable before the police physically arrest a criminal suspect, secure the scene, and ensure that there is no threat to the public or the officer's safety." *Id.* Viewed through this lens, this Court concluded that waiting for a sign language interpreter before performing field sobriety tests and making a DUI arrest was "not a reasonable modification of police procedures given the exigent circumstances of a DUI stop on the side of a

highway, the on-the-spot judgment required of police, and the serious public safety concerns in DUI criminal activity." *Id.* at 1086.

Similarly, in *Tucker v. Tennessee*, 539 F.3d at 536, the court affirmed summary judgment entered by the trial court and held that the police did not violate the ADA when they chose not to provide a sign language interpreter at the scene of a domestic violence arrest. The court held that:

> [w]here, as it occurred in this case, officers are presented with exigent or unexpected circumstances, it would be unreasonable to require certain accommodations be made in light of the overriding public safety concerns. *See e.g., Patrice*, 43 F. Supp. 2d at 1160 ("forestalling all police activity until an interpreter can be located to aid communication with the deaf protagonist would be impractical and could jeopardize the police's ability to act in time to stop a fleeing suspect, physically control the situation, or interview witnesses on the scene."). *Id.*

The *Tucker* court also correctly pointed out that "we rely on and expect law enforcement officers to respond fluidly to changing situations and individuals they encounter." *Id.* Accordingly, "[i]mposing a stringent requirement under the ADA is inconsistent with that expectation, and impedes their ability to perform their duties." *Id*; *see also Patrice*, 43 F. Supp. 2d 1156 (finding no violation of the ADA, when the police did not provide a sign language interpreter at the scene of a domestic disturbance arrest).

The Eighth Circuit has placed the "exigent circumstances" threshold much lower than a domestic violence arrest. In *Bahl v. City of Ramsey*, 695 F.3d 778,

784 (8th Cir. 2012), the court held that a traffic stop for running a red light constituted "exigent circumstances" and that the ADA did not require the officer to call for a sign language interpreter. *Id.* The court recognized that "[t]he duties of police officers during a traffic stop call for the exercise of significant judgment and discretion, and we will not second guess those judgments, where, as here, an officer is presented with exigent or unexpected circumstances. In these circumstances, it would be unreasonable to require that certain accommodations be made in light of overriding public safety concerns." *Id.* at 785. *See also Waller ex rel. Estate of Hunt v. Danville, Va.*, 556 F.3d 171, 175 (4th Cir. 2009) ("'[E]xigency' is not confined to split-second circumstances. Although the officers did not face an immediate crisis, the situation was nonetheless unstable . . . ." (citation omitted)).

On page 48 of her Initial Brief, Gevarzes claims that "[t]he officers testified that there were no exigent circumstances requiring a quick response." Yet Gevarzes includes no citations to the record to support this claim. In fact, the opposite is true. The officers unequivocally testified that waiting for an interpreter would have been unfeasible and that this was an emergency situation. (Slease Dep. 40:14-23 [Doc. 60-7]; Rizzo Dep. 89:3-24 [Doc. 60-5].)

Gevarzes further suggests that if exigent circumstances were present, then the police should have left the scene and "interviewed Gevarzes at [sic] later time."

(I.B. p. 25). This suggestion is ill-conceived. The police should not walk away from a domestic violence situation and leave the intoxicated parties to their own devices. Likewise, intoxicated people should not drive, as Gevarzes attempted to do before the police arrived. (*See* Kilpatrick Dep. 28:20-29:22 [Doc. 60-8]; Gevarzes Dep. 140:1-141:10 [Doc. 60-2].)

The police officers in this case were confronted with three intoxicated people having a heated fight outside the main entrance of a crowded bar and restaurant at 11:00 p.m. on a Saturday night. When the officers arrived, Gevarzes, whom the officers believed to be intoxicated, attempted to get in her car to leave the scene. A drunken domestic fight outside of a crowded bar late at night is not the sort of situation that lends itself well to waiting around for an interpreter. Waiting for a sign language interpreter under these conditions, when Gevarzes was capable of effectively communicating in writing, would have been unreasonable and was not required under the RA or ADA. The district court's order may easily be affirmed on these grounds.

### IV. Even if the police officers discriminated against Gevarzes, such discrimination was not intentional, as the officers reasonably believed they were effectively communicating with her.

Gevarzes is pursuing only compensatory damages. She is not pursuing injunctive relief. (Second Am. Cmpl. [Doc. 48].) Nor could she pursue injunctive relief. Both this Court and the Supreme Court have held that a plaintiff does not

have standing to seek injunctive relief by merely alleging a likelihood of being arrested again. *City of Los Angeles v. Lyons*, 103 S. Ct. 1660 (1983); *Shotz v. Cates,* 256 F.3d 1077, 1081 (11th Cir. 2001).

Assuming Gevarzes can otherwise satisfy every element of an ADA claim, she must still demonstrate "intentional discrimination or bad faith" to recover compensatory damages. *Badillo v. Thorpe,* 158 Fed. Appx. 208, 214 (11th Cir. 2005) (*citing Wood v. President & Trs. of Spring Hill Coll. In City of Mobile*, 978 F.2d 1214, 1219 (11th Cir. 1992). This Court has recently applied this standard to the RA as well. *Liese v. Indian River County Hospital District,* 701 F.3d 334, 348 (11th Cir. 2012). This requires a showing of deliberate indifference. *Id.*

To establish deliberate indifference, a plaintiff must show that "the defendant knew that the harm to a federally protected right was substantially likely and . . . failed to act on that likelihood." *Liese v. Indian River County Hosp. Dist.,* F.3d at 344 (quoting *T.W. ex rel. Wilson v. Sch. Bd. Of Seminole Cnty., Fla.,* 610 F.3d 334, 344 (11th Cir 2010). Deliberate indifference is an "exacting standard," as the indifference must be the result of a "deliberate choice." *Liese,* 701 F.3d at 344. Negligence, even if gross, is not enough. *Id.*

In the instant case, even if Gevarzes was harmed, the police officers did not know that this harm was occurring or even likely to occur. To the officers, and also to the lower court, this was a relatively simple case. The officers knew Behrens

37

attempted to pull Gevarzes off of McConnell; they just did not think this justified biting him hard enough to draw blood. (*See* Slease Dep. 39:10-13 [Doc. 60-7], Gevarzes Dep. 150:2-4 [Doc. 60-2].) This did not require the police officers to engage in a complex, lengthy interaction with Gevarzes. As noted by the district court, "there was not much story to tell." (Order on Sum. Judgment p. 7 n. 7 [Doc. 74].)

The police officers reasonably believed that providing Gevarzes with a pen and paper, which she used; speaking to her slowly; and repeating their statements when necessary provided her with an effective means of communication. (*See* Kilpatrick Dep. 53:9-21 [Doc. 60-8]; Rizzo Dep. 81:13-82:21, 84:14-85:8, 86:2-9, 90:21-25 [Doc. 60-5]; Slease Dep. 62:6-11, 63:5-16 [Doc. 60-7].) Gevarzes admits that her notes were responsive to the officers' questions. (Gevarzes Dep. 18:12-23 [Doc. 60-3].) Thus, the officers reasonably believed that they were honoring Gevarzes' rights and that they were providing her with an effective means of communication. (*See* Kilpatrick Dep. 53:9-21 [Doc. 60-8]; Rizzo Dep. 81:13-82:21, 84:14-85:8, 86:2-9, 90:21-25 [Doc. 60-5]; Slease Dep. 62:6-11, 63:5-16 [Doc. 60-7].)

This is similar to the facts presented in *Patrice v. Murphy*, 43 F. Supp. 2d 1156, 1161 (W.D. Wash. 1999), in which the court held that the ADA did not require the police officers to provide a sign language interpreter before arresting a

38

deaf plaintiff for a domestic disturbance. One of the issues in that case involved the extent to which the plaintiff could communicate through alternative means. The deaf arrestee gave the responding officers a one-paragraph narrative, in broken English, describing her side of the story. *Id.* at 1158. Given that fact, the court held that there was "no indication that the defendant officers knew or should have known that plaintiff was having trouble understanding the situation, could not comprehend the written forms, or was unable to adequately provide her narrative." *Id.* at 1161 n. 7. Accordingly, there could be no claim for an alleged ADA discrimination. *Id.*

It is noteworthy that in the instant case, the district court judge, with years of legal training and experience, was unable to find any evidence of discrimination. With the benefit of 20/20 hindsight and calm deliberation, and upon full and careful review of the factual record, the federal judge concluded that Gevarzes was effectively communicating with the police officers on the scene of her arrest. (Order on Sum. Judgment pp. 6-8 [Doc. 74].) If the learned federal judge could reach this determination, then it cannot be said that it was so clear to the police officers on the scene that the communication with Gevarzes was ineffective, such that the decision not to call a sign language interpreter could ever rise to the level of deliberate indifference.

Even if the officers were grossly negligent, this does not rise to the level of "deliberate indifference" and cannot substantiate a claim for compensatory damages under the ADA or the RA. *See Liese*, 701 F.3d at 344. Gevarzes cannot show that the police officers knew they were violating her federally protected right to effective communication.

**V.    Even if an individual officer did knowingly violate Gevarzes' rights, that conduct is not attributable to the City where the City's policies specifically prohibit the type of discrimination alleged by Gevarzes.**

The district court also concluded that summary judgment for the City would be appropriate because any alleged discrimination by the officers could not be attributed to the City. (Order on Sum. Judgment p. 9 n. 9 [Doc. 74].) The City has specific policies in place to ensure that deaf individuals receive appropriate accommodations to allow them to participate in police activity. Importantly, the officers unequivocally testified that they were familiar with these policies and that they did not have the discretion to ignore the policy mandates. This undisputed fact is also dispositive of Gevarzes' claims.

For a violation to be attributable to the City, the violation must have been committed by an official whose acts can fairly be said to represent the actions of the government entity. *Liese*, 701 F.3d at 349. This Court has held that "an official is someone who enjoys substantial supervisory authority within an organization's chain of command so that, when dealing with the complainant, the official has

complete discretion at a key decision point in the administrative process." *Id.* at 350.

Addressing this issue in *Liese,* this Court held that "an official is someone who enjoys substantial supervisory authority within an organization's chain of command so that, when dealing with the complainant, the official had complete discretion at a 'key decision point' in the administrative process." *Id.* at 350. In that case, doctors had such "complete discretion," because the hospital policies did not give any guidance or recommendations as to when the hospital staff should use aids to communicate with the deaf. *Id.* at 337.

In the instant case, the officers did not have discretion to alter the policies of the Port Orange Police Department. The City policies require its officers to "furnish appropriate auxiliary aids and services whenever necessary to ensure effective communication with individuals with hearing impairments." (P.P. 42.9.48 [Doc. 60-15].) "Auxiliary aids and services" includes qualified interpreters. (P.P. 42.9.49 [Doc. 60-15].) But it also includes writing materials, note pads, and other effective methods of communication. *Id.* Normally, an officer must give primary consideration to the choice of the individual, unless the officer can show another equally effective means of communication, or that the individual's choice will fundamentally alter procedure, or cause an undue burden. (P.P. 42.9.50-42.9.51 [Doc. 60-15].)

The officers all knew the policies. (Kilpatrick Dep. 51:5-53:8 [Doc. 60-8]; Rizzo Dep. 76:9-81:8, 83:10-84:13 [Doc. 60-5]; Slease Dep. 58:12-59:14, 61:8-62:11 [Doc. 60-7].) In particular, every officer involved in this incident knew that if a sign language interpreter were required to facilitate effective communication, then they were required to obtain one on the scene of the arrest. (Kilpatrick Dep. 51:5-53:8 [Doc. 60-8]; Rizzo Dep. 76:9-81:8, 83:10-84:13 [Doc. 60-5]; Slease Dep. 58:12-59:14, 61:8-62:11 [Doc. 60-7].) Moreover, the officers all knew they lacked the authority to alter these policies. (Kilpatrick Dep. 53:9-21 [Doc. 60-8]; Rizzo Dep. 81:13-82:21, 82:22-83:9, 84:14-85:8, 86:2-9, 90:21-25 [Doc. 60-5]; Slease Dep. 62:6-16, 63:5-16 [Doc. 60-7].)

These officers all lacked "substantial supervisory authority" to create City policy and are not "officials" within the meaning of *Liese*. Therefore, their actions, even if deliberately indifferent, are not attributable to the City. Gevarzes cannot recover against the City under the ADA or RA.

## CONCLUSION

The material facts of this case are not complicated and are not in dispute. Gevarzes was properly arrested for domestic battery after biting her boyfriend – a fact not in dispute. She was not arrested because the police officers mistook a physical manifestation of her disability as a sign of criminal activity. The Court need look no further, as the RA and ADA do not apply under the facts of this case.

But even assuming for the sake of argument that the RA and ADA do apply, the facts of this case clearly support entry of summary judgment in favor of the City. There is nothing in the record to establish that the City of Port Orange was deliberately indifferent to Gevarzes' needs for additional services to accommodate her hearing disability. The police officers on the scene provided an accommodation, and Gevarzes used it effectively.

An interpreter would not have added anything to the investigation, and Gevarzes did not need an interpreter to effectively communicate with the police. The police knew Gevarzes was able to communicate with them, and they knew that a crowded, late-night parking lot was not an ideal place to carry out a lengthy and exhaustive investigation, especially when the facts of who-bit-whom were clear.

Even if this written communication were now determined to be ineffective, the police officers were not required to wait for a sign language interpreter under the exigent circumstances of this case.

There are many reasons to affirm the district court's order granting summary judgment to the City. For any and all of the reasons described herein, this Court should affirm the district court's order granting summary judgment to the City of Port Orange.

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

_X_  this brief   contains 9,726 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii); and

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

_X_  this brief has been prepared in a proportionally spaced typeface using Microsoft Word version 2010 in Times New Roman 14 Font.

Respectfully submitted,

JOSHUA B. WALKER, ESQ.
Florida Bar No. 0047614
JWalker@drml-law.com
F. SCOTT PENDLEY, ESQ.
Florida Bar No. 0341347
FPendley@drml-law.com
Dean, Ringers, Morgan & Lawton, P.A.
Post Office Box 2928
Orlando, Florida 32802-2928
Tel:   407-422-4310
Fax:   407-648-0233
Attorneys for Appellee City of Melbourne

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on June 30, 2014, a true and correct copy of the foregoing has been electronically filed and provided via overnight delivery to the 11th Circuit Court of Appeals, 56 Forsyth Street, N.W., Atlanta, GA 30303; Matthew W. Dietz, Esq., 2990 Southwest 35th Avenue, Miami, FL 33133; and Caroline Jackson, Esq., 8630 Fenton St., Ste. 820, Silver Spring, MD 20910.

JOSHUA B. WALKER, ESQ.
Florida Bar No. 0047614
JWalker@drml-law.com
F. SCOTT PENDLEY, ESQ.
Florida Bar No. 0341347
FPendley@drml-law.com
Dean, Ringers, Morgan & Lawton, P.A.
Post Office Box 2928
Orlando, Florida 32802-2928
Tel:   407-422-4310
Fax:   407-648-0233
Attorneys for Appellee City of Port Orange